607 F.2d 61
 79-2 USTC P 9632
 UNITED STATES of America and Robert H. McCorry, Special
Agent of the Internal Revenue Service, Appellees,
v.
GARDEN STATE NATIONAL BANK, Ben Shafer and Boot Strap, Ltd.,
Appellants.
UNITED STATES of America and Robert H. McCorry, Special
Agent of the Internal Revenue Service, Appellees,
v.
PALISADES SAVINGS AND LOAN ASSOCIATION, Ben Shafer and Boot
Strap, Ltd., Appellants.
UNITED STATES of America and Robert H. McCorry, Special
Agent of the Internal Revenue Service, Appellees,
v.
CITIZENS FIRST NATIONAL BANK OF NEW JERSEY, formerly known
as Oakland State Bank, Ben Shafer and Boot Strap,
Ltd., Appellants.
UNITED STATES of America and Robert H. McCorry, Special
Agent of the Internal Revenue Service
v.
FIRST JERSEY SAVINGS AND LOAN ASSOCIATION, Ben Shafer and
Boot Strap, Ltd., Appellants.
UNITED STATES of America and Robert H. McCorry, Special
Agent of the Internal Revenue Service, Appellees,
v.
UNITED JERSEY BANK, Ben Shafer, Marilee Shafer, and Boot
Strap, Ltd., Appellants.
UNITED STATES of America and Alexander Dombroski, Special
Agent, Internal Revenue Service, Appellees,
v.
ORANGE SAVINGS BANK.
UNITED STATES of America and Alexander Dombroski,
Special Agent, InternalRevenue Service
v.
The HERITAGE BANK, and Dorothy Miller, Roger L. Keech,
Sandra J. Keech, and Lakeville Fasteners, Inc., Appellants.
 Nos. 79-1425 to 79-1428, 79-1681 and 79-1682.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 4, 1979.
Decided Oct. 10, 1979.
 
 Bender & Frankel, Sandor Frankel (argued), New York City, for intervenors-appellants, Ben Shafer and Boot Strap, Ltd. and Roger L. Keech, Sandra J. Keech, and Lakeville Fasteners, Inc.
 Robert J. Del Tufo, U. S. Atty., Eric L. Chase, Asst. U. S. Atty. (argued), Newark, N. J., for appellees, United States of America and Robert McCorry.
 M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Charles E. Brookhart, John A. Dudeck, Jr., Tax Division, Dept. of Justice, Washington, D. C. (argued), for appellees, United States of America and Alexander Dombroski.
 Before ALDISERT, ROSENN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 These appeals call upon us once again to review the enforcement procedures pertaining to Internal Revenue summonses. In Nos. 79-1425 through 79-1428, taxpayers Shafer and Boot Strap, Ltd. appeal from the district court's order enforcing summonses issued to banks for the production of records relating to taxpayers' liability. In No. 79-1681, Marilee Shafer, in addition to Shafer and Boot Strap, Ltd., appeals. A similar appeal is presented by taxpayers Roger and Sandra Keech and Lakeville Fasteners, Inc. at No. 79-1682.[1]
 
 
 2
 Benefiting from the instruction of United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); United States v. McCarthy, 514 F.2d 368 (3d Cir. 1975); United States v. Genser, 595 F.2d 146 (3d Cir. 1979) (Genser II ); and our recently published opinions in United States v. Genser, 602 F.2d 69 (3d Cir. 1979) (per curiam) (Genser III ), and United States v. Serubo, 604 F.2d 807 (3d Cir. 1979), we affirm the district court's enforcement of all summonses in both appeals, but we do so upon different grounds than the grounds upon which the district court relied.[2]
 
 I.
 A. Shafer and Boot Strap (Shafer)
 
 3
 In September, 1977, the Internal Revenue Service began investigating Shafer's tax liability for the years 1974, 1975, and 1976. Appellee Special Agent Robert McCorry was assigned to the case at the outset and has since been in charge of the investigation. A revenue agent was also assigned to the investigation in June 1978.[3] In July 1978, pursuant to I.R.C. §§ 7602, 7604,[4] McCorry issued four summonses which are subjects of this appeal, one to each of four respondent banks. On January 19, 1979, an additional summons was issued to United Jersey Bank. The record does not reveal the issuance date of the last summons issued to the Columbia Savings and Loan Association, however, inasmuch as these last two summonses were treated as a unit by all parties and the district court, we will assume that the Columbia summons issued no later than January 19, 1979. Each summons sought production of testimony, books, records, papers, and other data relating to Shafer. Notice was given Shafer under I.R.C. § 7609(a), and Shafer immediately caused the summonses to be stayed under I.R.C. § 7609(b)(2).
 
 
 4
 On October 6, 1978 the Government applied for orders directing the banks to show cause why the first four summonses which had issued in July, should not be enforced. Shafer intervened to oppose enforcement on the ground that the summonses were issued solely for purposes of a criminal investigation and were therefore unenforceable under United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1977). The banks, which had been subpoenaed, took no position on enforcement. An evidentiary hearing was held over the objection of the Government on January 11, 1979. The Government contended that the issue of enforcement should have been disposed of on the pleadings.[5] On January 22, 1979 the district court, by memorandum opinion and order, directed compliance with these four summonses. United States v. Garden State National Bank, 465 F.Supp. 437 (D.N.J.1979).[6] In its opinion, the district court stated that the I.R.S.'s procedures were characterized by the "bad faith" condemned by LaSalle. The district court based this characterization on testimony of I.R.S. witnesses. That testimony purportedly established that the Service would not agree to negotiate a compromise on the civil aspects of a case until the issue of referral (to the Department of Justice) had been resolved. In essence, the district court determined that once a special agent of the Criminal Investigation Division has been assigned, no compromise can be effected by I.R.S. even though I.R.S. has not decided to refer the investigation to the Justice Department for criminal prosecution. Accordingly, the district court declared that, measured against its newly evolved "conference for compromise" standard, a taxpayer can show "institutional bad faith" on the part of I.R.S. if a conference looking toward a possible compromise is sought, and I.R.S. refuses to engage in such compromise negotiations. In such a situation, the district court would have held that "bad faith" had been established "in that the civil summons was being used solely as a means for deciding whether or not to refer for criminal prosecution, meanwhile (enabling the I.R.S. to gather) evidence in support," Id. at 440. Despite this dictum, the district court enforced all four bank summonses on the ground that:
 
 
 5
 (s)ince taxpayer has stated on the hearing record that no request for conference was made, the court finds that the problems which concern it are abstract, and concludes that taxpayer has not met the burden established by LaSalle.
 
 
 6
 Id. at 441.
 
 
 7
 Shafer appealed, and the Government consented to a stay pending determination of the appeal as to these four summonses.[7] This court ordered a stay as to the summonses appealed at No. 79-1681, See note 5 Supra.
 
 B. Keech and Lakeville (Keech)
 
 8
 The Keech investigation by I.R.S. began sometime prior to February 1977. Appellee Special Agent Alexander Dombroski issued summonses similar to those in the Shafer matter to two banks. One summons was issued in July 1977 and the other in September 1977. Compliance with both summonses was stayed pursuant to I.R.C. § 7609(b)(2). In February 1979, the Government obtained orders to show cause why the summonses should not be enforced, and Keech intervened. On April 23, 1979, oral argument, but no testimony, was heard before the district court. At its conclusion, Keech was denied an evidentiary hearing and discovery. An order was entered on May 8, 1979 enforcing the summonses. The district court's stated ground for these actions differed from the grounds upon which it relied in granting enforcement of the Shafer summonses. Here the district court held that inasmuch as I.R.S. always retains an ultimate residual interest in collecting tax money even after a taxpayer's criminal conviction for tax fraud, I. e. I.R.S. never abandons its civil interest, a taxpayer in Keech's position could Never satisfy the LaSalle requirement of showing that the summons had been institutionally issued solely for purposes of a criminal investigation.
 
 
 9
 Keech moved for a stay of enforcement in this court, which we granted on June 1, 1979.[8]
 
 II.
 
 10
 The central question in these appeals is whether the I.R.S. summonses were properly issued. The I.R.S. has power to issue summonses in the course of its investigation of civil tax liability even if evidence thereby uncovered might subsequently serve as the basis for a criminal prosecution of the taxpayer. The I.R.S. may not, however, use its power to issue administrative summonses for the Sole purpose of conducting or furthering a criminal investigation on its own behalf, or on the behalf of the Justice Department. Both Shafer and Keech contend that the summonses issued for their bank records were issued in bad faith for the sole purpose of furthering a criminal investigation and prosecution.
 
 
 11
 United States v. LaSalle National Bank, supra; Genser II and III, supra ; and United States v. Serubo, supra, make clear that in a situation such as is presented here, where the I.R.S. has Not recommended criminal prosecution to the Justice Department and the investigating agent has Not recommended prosecution to his superiors within the Service, the taxpayer bears an almost impossible burden to resist enforcement of the summons. However, because of the importance of this issue, and the frequency with which it arises both here and in the district courts, we feel impelled to restate for the guidance of the bar and the district courts the various considerations bearing on the enforcement of I.R.S. summonses.
 
 
 12
 In LaSalle, the Supreme Court established a prophylactic cutoff rule: after a particular investigation has been referred to the Justice Department for criminal prosecution, the Service may not issue summonses for taxpayer-related records pertaining to that matter. That event, referral, was chosen by the Court because of the nature of tax enforcement. Tax fraud leads to both civil and criminal liability, and the I.R.S. issues summonses in investigations that lead to both types of liability under the scheme established by Congress in the 1939 Internal Revenue Code. See 437 U.S. at 308-11, 98 S.Ct. 2357. Once the Service refers the case to the Justice Department for prosecution of criminal tax fraud, however, the civil and criminal aspects of the case begin to diverge. The Justice Department at that juncture assumes full control over the case, and the Service loses its legal authority to settle any civil or criminal liability. Although the Service undoubtedly reserves an interest in civil collection of withheld tax money, LaSalle barred use of I.R.S. summonses after a recommendation of prosecution to the Justice Department. This prohibition was designed to avoid the possibility that the summonses would be used as an adjunct to the Justice Department's sources of criminal discovery. See id. at 311-13, 98 S.Ct. 2357.
 
 
 13
 The Court sought to prevent the widening of the scope of criminal discovery and the usurpation by the Service of the traditional grand jury role as the primary criminal investigatory tool. See id. at 313 n.15, 98 S.Ct. 2357. Where, however, the case had not yet been referred to the Justice Department, the Court held I.R.S. summonses to be presumptively valid, balancing the need for discovery of information in civil tax investigations against the attenuated possibility of abuse. As long as no referral has been made, this presumption of validity obtains, even when the investigating agent decides that criminal prosecution would be feasible or when he recommends to his Service superiors that they in turn refer the matter to the Justice Department. See id.[9]
 
 
 14
 While the LaSalle Court was unanimous in imposing an absolute ban on enforcement of I.R.S. summonses issued after the case had been referred to the Justice Department, it divided on the question of validity of summonses which were issued Before that referral. Four Justices would have held any summons issued before the cutoff to be conclusively valid. See 437 U.S. at 319-21, 98 S.Ct. 2357 (Stewart, J., dissenting). The majority, however, left open the possibility that such a pre-referral summons could be challenged by the taxpayer if the Service as an institution had not issued the summons in "good faith." See 437 U.S. at 313-18, 98 S.Ct. 2357.
 
 
 15
 LaSalle defined "good faith" in this context both affirmatively and negatively. In its affirmative definition, LaSalle referred to the four prongs of the Prima facie showing of "good faith" as explicated in United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), namely:
 
 
 16
 (1) that the investigation is being conducted for a legitimate purpose (I. e., that the I.R.S. retains an interest in civil tax collection);
 
 
 17
 (2) that the material sought is relevant to the legitimate purpose of the investigation;(3) that the information is not yet in the possession of the I.R.S.; and
 
 
 18
 (4) that the proper administrative steps have been followed.
 
 
 19
 It is the Government's burden to satisfy all four prongs of the Powell test. Id. at 57, 85 S.Ct. 248. The requisite showing is generally made by affidavit of the agent who issued the summons and who is seeking enforcement. United States v. McCarthy, 514 F.2d 368, 372 (3d Cir. 1975). "(T)he purpose of the good-faith inquiry is to determine whether the agency is honestly pursuing the goals of § 7602 by issuing the summons." LaSalle, 437 U.S. at 316, 98 S.Ct. at 2367. Those goals may be summarized as (1) ascertaining the correctness of a return, (2) making a return where none has been made, (3) determining tax liability, and (4) collecting taxes. LaSalle cautions that the I.R.S. "at all times must use the summons authority in good-faith pursuit of (these) congressionally authorized purposes," Id. at 318, 98 S.Ct. at 2368.
 
 
 20
 Genser III Thereafter made clear that an institutional commitment to recommend for prosecution without more did not necessarily demonstrate "bad faith":
 
 
 21
 It is not just an institutional commitment to recommend prosecution that renders a summons issued under § 7602 invalid; rather, it is the absence of a civil purpose for that summons that triggers the LaSalle rule.
 
 
 22
 602 F.2d at 71. Genser III implemented its holding by explaining the remand of Genser II to the district court:
 
 
 23
 Likewise, in remanding the case to the district court, we noted, "The district court failed, however, to confront defendants' claim that the IRS, as an institution, had committed itself before December 12, 1975, to refer the case for prosecution And that summonses issued after that commitment served no civil purpose." 595 F.2d at 151 (emphasis supplied).
 
 
 24
 602 F.2d at 71.
 
 
 25
 Serubo, the most recent of this Circuit's enforcement discussions, in restating this aspect of the LaSalle holdings, said: "(B)ad faith abuse of the powers granted by § 7602 occurs when the Service . . . abandon(s) in an institutional sense . . . the pursuit of civil tax determination or collection," 604 F.2d at 811. It is this concept of "bad faith" that gives rise to what we have characterized as a negative definition of "good faith." Essentially, once the Government has carried its Powell burden of proof of "good faith," the burden shifts to the taxpayer to show that the institutional "good faith" required by LaSalle does not exist.[10] LaSalle explained this latter "good faith" inquiry as follows:
 
 
 26
 Without doubt, this burden is a heavy one. Because criminal and civil fraud liabilities are coterminous, the Service rarely will be found to have acted in bad faith by pursuing the former. On the other hand, we cannot abandon this aspect of the good faith inquiry altogether. We shall not countenance delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution. Such a delay would be tantamount to the use of the summons authority after the recommendation and would permit the Government to expand its criminal discovery rights. Similarly, the good-faith standard will not permit the IRS to become an information-gathering agency for other departments, including the Department of Justice, regardless of the status of criminal cases.
 
 
 27
 437 U.S. at 316-17, 98 S.Ct. at 2368 (footnotes omitted). Thus, for enforcement of a summons, LaSalle requires (1) that no recommendation for prosecution shall have been made to the Justice Department; (2) that the Powell "good faith" requirements have been met; and (3) that the taxpayer has failed to refute the existence of institutional "good faith." LaSalle, however, foresaw that future cases might add further definition to these standards:
 
 
 28
 These requirements are not intended to be exclusive. Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process.
 
 
 29
 Id. at 318 n.20, 98 S.Ct. at 2368.
 
 
 30
 In Genser II and III, followed by Serubo, this court fulfilled the LaSalle prophecy. Judge Gibbons, writing for this court in Serubo, discussed the "good faith" standards which had been analyzed in Genser II :[11]
 
 
 31
 Genser II places a further gloss on the LaSalle standards. There we held that the test of the validity of an IRS summons was not the existence of "a general civil purpose" for the investigation, but rather the purpose of the individual summons at issue. "If any one . . . (summons) . . . were issued solely for a criminal purpose, the fruits of that summons would have to be suppressed, even in the face of an overwhelmingly civil purpose of the investigation as a whole." 595 F.2d at 150. This standard, however, does not require "a district court to examine every summons issued in every investigation." Id. at 151. Since LaSalle requires institutional abandonment of a civil collection purpose, and since, under LaSalle, the intent of a single agent cannot be imputed to the institution as a whole, we reasoned that summonses issued by an investigating agent before that agent recommended prosecution would be presumptively valid. But that presumption could be overcome by a showing that the agent had "issued summonses at the request of the United States Attorney or delayed his recommendation at the request of his superiors solely to further a criminal investigation." Id.
 
 
 32
 In Genser II, we placed the burden upon the defendant to overcome the presumption of validity attaching to pre-recommendation subpoenas.
 
 
 33
 604 F.2d at 811-12.
 
 
 34
 Either before or after the special agent has recommended prosecution to his I.R.S. superiors, the taxpayer bears the burden of disproving a civil purpose. Before such a recommendation to refer is made, Genser II holds that the summons issued by an investigation agent would be "virtually unassailable," 595 F.2d at 151, thereby imposing a burden on the taxpayer which is almost insurmountable. Even After the recommendation to refer has been made, LaSalle characterizes the burden on the taxpayer as "heavy." In both instances the Service may defend by showing the civil purpose of each summons.
 
 
 35
 Thus, in summary, three discrete time periods have been delineated. Once the Service has recommended prosecution to the Justice Department, LaSalle conclusively precludes further issuance of I.R.S. summonses. Prior in time to such a recommendation, summonses are presumptively valid at two levels. At the first level, if the investigating agent has already recommended prosecution to his superiors (but they have not recommended prosecution to the Justice Department even though a commitment to recommend may have been made, See Genser III, at 71), LaSalle imposes a "heavy" burden on the taxpayer to prove "bad faith." At the second level, where the investigating agent has not even recommended prosecution to his superiors, Genser II and Serubo severely limit the ability of the taxpayer to challenge enforcement, characterizing the summonses as "virtually unassailable," Genser II, 595 F.2d at 151. In this latter context, Genser II described two situations where a taxpayer might satisfy even this insurmountable burden. The first example was one where the summonses were issued at the request of a United States Attorney. The second example was one where the agent had already decided to recommend prosecution but had delayed doing so formally at the behest of his superiors for the sole purpose of allowing issuance of summonses in furtherance of a criminal investigation.[12] While the validity of each summons may constitute a separate legal issue, See id. at 151, no summons-by-summons determination is required except in the Serubo situation, where it appeared that an I.R.S. agent was actually working with the United States Attorney. Moreover, discovery is strictly limited beyond Pro forma basic discovery. Id. at 152, See 74 Infra.
 
 
 36
 In short, LaSalle may not have closed the door in the taxpayer's face, but neither did it leave much more than a very slight opening.
 
 III.
 
 37
 To this point, we have summarized the substantive law relevant to enforcement proceedings. The procedures by which these proceedings are to be conducted and by which they may be challenged have previously been set down in United States v. McCarthy, 514 F.2d at 372-77. More recently, Genser I has reaffirmed the McCarthy procedures as follows:
 
 
 38
 In United States v. McCarthy, 514 F.2d 368 (3d Cir. 1975), this court carefully formulated procedural guidelines for use in enforcement proceedings and provided that an evidentiary hearing is an "integral part" of those proceedings. Under McCarthy, the IRS must be prepared to make a preliminary showing that the investigation has a legitimate purpose and that the inquiry may be relevant to that purpose, that the information sought is not already in the government's possession, and that the government has followed the procedural steps required by the Internal Revenue Code. The burden then shifts to the opposing party to establish any defenses or to prove that enforcement would constitute an abuse of the court's process.[15] If the district court concludes that it cannot fairly decide the case on the record before it, it may direct further proceedings, including discovery, if requested. Id. at 372-73. (Citations omitted).[16]
 
 
 39
 15. The burden is on the taxpayer to negate the existence of a proper civil purpose. (Citations omitted). The Supreme Court has characterized this burden as "heavy." United States v. LaSalle National Bank, supra, (437) U.S. at (316), 98 S.Ct. 2357.
 
 
 40
 16. The McCarthy court stated: "Although our proposed procedure for summons enforcement contemplates that provision for an evidentiary hearing be an integral part of the proceedings, implicit in our design is the realization that not every summons enforcement proceeding will require an evidentiary hearing. Thus, if the person summoned neither puts in issue allegations of the complaint nor raises proper affirmative defenses, no evidentiary hearing will be required; the matter can be decided on the pleadings." 514 F.2d at 373.
 
 
 41
 582 F.2d at 302 (emphasis supplied).
 
 
 42
 Thus the Government, must make the Powell prima facie showing. Then the taxpayer has the burden "to negate the existence of a proper civil purpose," Id. at 302 n.15. To meet this burden, the taxpayer must "establish any defenses or . . . prove that enforcement would constitute an abuse of the court's process," Id. at 302. In responding to the Government's showing, it is clear that a taxpayer must factually oppose the Government's allegations by affidavit. Legal conclusions or mere memoranda of law will not suffice. See Thornton v. United States, 493 F.2d 164, 167 (3d Cir. 1974). In the absence of such a response by the taxpayer, uncontested allegations in the Government's petition and affidavit must be accepted as admitted. Moreover, if at this stage the taxpayer cannot refute the government's Prima facie Powell showing or cannot factually support a proper affirmative defense, the district court should dispose of the proceeding on the papers before it and without an evidentiary hearing.
 
 
 43
 Where, however, material Government allegations are factually refuted by the taxpayer, thus presenting a disputed factual issue, or where proper affirmative defenses, such as those alleging "bad faith" under the tests of LaSalle and Genser II, are factually supported by the taxpayer's affidavits, the taxpayer is entitled to an evidentiary hearing. McCarthy, 514 F.2d at 368. Allegations supporting a "bad faith" defense are, as we have stated, insufficient if conclusionary. The affidavit must particularize those specific facts from which an inference may be drawn that the conduct of the Service was the same as, or similar to, the hypothetical conduct condemned in LaSalle and Genser II. In those cases, as earlier noted, two examples were given: one, that a summons was issued at the request of the Justice Department; the other, that formal recommendations for prosecution were being delayed until a summons could be issued and enforced, solely to further a Criminal prosecution.
 
 
 44
 The taxpayer is assisted in meeting his burden by the availability of certain basic discovery to which we have held he is entitled in Genser II :
 
 
 45
 (1) the identities of the investigating agents,
 
 
 46
 (2) the date the investigation began,
 
 
 47
 (3) the dates the agent or agents filed reports recommending prosecution,
 
 
 48
 (4) the date the district chief of the Intelligence Division or Criminal Investigation Division reviewed the recommendation,
 
 
 49
 (5) the date the Office of Regional Counsel referred the matter for prosecution.
 
 
 50
 (6) the dates of all summonses issued under 26 U.S.C. § 7602, (and)
 
 
 51
 (7) the nature of any contacts, relating to and during the investigation, between the investigating agents and officials of the Department of Justice.
 
 
 52
 595 F.2d at 152. If the taxpayer's evidence reveals:
 
 
 53
 (1) that the IRS issued summonses after the investigating agents recommended prosecution, (2) that inordinate and unexplained delays in the investigation transpired, or (3) that the investigating agents were in contact with the Department of Justice,
 
 
 54
 the district court must then permit further investigation. Id.[13]
 
 IV.
 
 55
 Under the standards and procedures we have set forth above, the record reveals that neither Shafer nor Keech has met its burden of showing "bad faith" on the part of the Service, nor has either established a right to further discovery or to an evidentiary hearing.[14]
 
 A.
 
 56
 In McCarthy, the Government had failed to establish all elements of the Prima facie Powell requirements. Thus the district court's order of enforcement was reversed on appeal. In remanding to the district court, however, the McCarthy court discussed considerations bearing on a defendant's required showing.
 
 
 57
 The defendant in McCarthy had alleged no more than that the summons was unenforceable since it was issued for criminal purposes and emphasized that the investigation was being conducted by the I.R.S. investigatory branch, and that no revenue agent was assigned to the case when the summons issued. 514 F.2d at 373-74. These allegations in a pre-recommendation context were held insufficient.[15]
 
 
 58
 The court in McCarthy also undertook consideration of the defendant's attack upon the Service's "good faith." That challenge was in terms of an alleged absence of civil purpose in the I.R.S.' investigation. While holding that the defendant's allegations were insufficient to raise the issue of criminal purpose, the McCarthy court, in light of the decisional law as it then was, held that the allegations "although not very strong, sufficiently raise the possibility that the IRS agents charged with the investigation of defendant-corporation had no intention of pursuing any civil remedies as to bring into question their good faith," Id. at 375. The district court was thereupon ordered to conduct a hearing as to that issue.
 
 
 59
 Compared with the McCarthy allegations, Shafer's allegations are far less substantial.[16] The affidavit filed on behalf of Shafer, in response to the Government's petitions, was not the affidavit of the taxpayer but was rather that of his counsel. The Government's petitions and affidavits, to which the Shafer affidavit responded, reveal that the Powell requirements were fully met, and that "no recommendation for prosecution of the taxpayer for the years and tax returns under investigation has been made to the United States Department of Justice," Shafer App. at A21, A32, A43, A54. Despite this showing by the Government, Shafer's only "response" or "affirmative defense" to the Government's petition was couched in legal conclusions rather than in factual terms. For example, paragraph 2 alleged: "the summonses were not issued in good faith in that they have been issued solely for the purpose of criminal investigation as determined by an examination of the institutional posture of the I.R.S.," Shafer App. at A61.
 
 
 60
 Paragraphs 3 and 4 of that same affidavit assert that the requirements of LaSalle were not met by the Government's petitions, and that the Government's petitions failed to satisfy the criteria for judicial enforcement of I.R.S. summonses. Id. at A61-62. Moreover, Shafer has never disputed the fact that no recommendation for prosecution has ever been made by the Service to the Department of Justice. Indeed, not the slightest suggestion appears in the papers filed that any recommendation was ever made even Within the I.R.S.[17] Significantly, the Shafer affidavit nowhere disputes any allegations made in the Government's enforcement papers.
 
 
 61
 We are aware that paragraph 4 of the Shafer affidavit refers to a memorandum of law which was evidently submitted to the district court, but a legal memorandum or brief cannot substitute for evidence or for sworn facts in an affidavit. This would be so even if the memorandum of law submitted to the district court had been made available to us, which it was not. Thus, even tested by the standards of pre-LaSalle, pre-Genser, and pre-Serubo jurisprudence, the showing made by Shafer was insufficient to warrant an evidentiary hearing.
 
 
 62
 Nevertheless the district court did afford Shafer the hearing Shafer sought. An examination of the record developed at that hearing, however, reveals little more than was disclosed by Shafer's initial papers. Only two Government witnesses testified; Shafer's only evidence was a page from the I.R.S. manual. Read charitably, the record merely establishes the following:
 
 
 63
 (1) as of the time the summonses issued, the I.R.S. under its own internal procedures would not have been willing to discuss compromise of Shafer's civil tax liability, 465 F.Supp. at 439;
 
 
 64
 (2) nine months passed while a special agent investigated the cases before a revenue agent was assigned, See Trial Transcript, Jan. 11, 1979, at 15-16;
 
 
 65
 (3) nearly four months elapsed between issuance of the summonses and the Government's attempt to enforce them, during which time the district court found that referrals took place "up to and down from the regional level for clearance to proceed," 465 F.Supp. at 440; and
 
 
 66
 (4) Special Agent McCorry told his supervisor that this was "a real good criminal case," Trial Transcript, Jan. 11, 1979, at 46-47.
 
 
 67
 These facts, even if accepted as true, neither singularly nor in combination rise to the level required to prove "bad faith," or to justify a hearing under the decisions of the Supreme Court and this court.
 
 
 68
 As we have already observed, the refusal of the Service to enter into compromise negotiations, standing alone, does not amount to "bad faith." See note 7 Supra. We have also noted that the type of agents used by I.R.S. to investigate a particular case does not characterize the case in any way as "civil" or "criminal." See note 3 Supra. Nor is any inference of "bad faith" necessarily to be drawn from the lapse of time between the issuance and enforcement of the summonses.[18] In any event, the uncontradicted testimony of Special Agent McCorry was to the effect that the nine-month delay was partially attributable to his working on another matter, Trial Transcript, Jan. 11, 1979, at 16. He also testified without contradiction that the referrals "up and down" the I.R.S. administrative chain, which delayed enforcement, were standard Service procedure. Id. at 57. Finally, the charge made by Shafer that an agent had characterized the investigation as "a real good criminal case" is insufficient to amount to "bad faith," since the agent's personal intent is irrelevant to the institutional "good faith" of the Service. LaSalle, 437 U.S. at 316, 98 S.Ct. 2357; See note 10 Supra.
 
 
 69
 Shafer additionally complains that he sought prehearing discovery which was improperly denied by the district court. We have stressed in this opinion, just as this court did in McCarthy, that conclusionary allegations cannot take the place of hard evidence or allegations in fact under oath. In this respect, Shafer's papers responding to the Government's petitions and seeking dismissal of those petitions, or alternatively an evidentiary hearing with appropriate prehearing discovery, do not satisfy our standard. As we have earlier held, Shafer had no right to a hearing under McCarthy. Notwithstanding, the district court accorded him a hearing, yet, despite that additional opportunity to bolster his case, the evidence adduced at that hearing did not meet the burden which the cases have placed on Shafer.
 
 
 70
 Without deciding whether Genser II, requiring "basic discovery," See 74 Supra, should ever be given retroactive effect, we are not persuaded that in light of this record any discovery should be permitted here. Our reading of the record discloses that the information which would normally be allowed a taxpayer under the basic discovery provided by Genser II came to light at the hearing. Furthermore, the two "delays" about which Shafer complains are neither inordinate nor are they unexplained within the meaning of Genser II.
 
 
 71
 We are satisfied therefore that Shafer's showing falls far short of defeating the presumption of validity of a pre-recommendation summons. He has not carried the "heavy" burden imposed by LaSalle, let alone the virtually insurmountable burden imposed by Genser II. Accordingly, since Shafer has failed to mount an effective challenge to the Government's Powell showing or to the institutional "good faith" of the Service, the Shafer subpoenas were properly enforced.
 
 B.
 
 72
 Unlike the Shafer proceeding where an evidentiary hearing was afforded, the district court denied such a hearing to Keech. This ruling was appropriate in light of LaSalle and Genser II and III. We are mindful that the Keech affidavit in response to the Government's petition for enforcement is somewhat more factual than the Shafer affidavit. However, the facts to which Keech's attorney certified, even if accepted as true, cannot overcome the presumptively valid pre-recommendation summonses under the standards of LaSalle, Genser II and III, and Serubo. Our discussion in the Shafer appeal is dispositive of Keech's contentions.[19]
 
 
 73
 The only essential distinction between the Shafer and Keech cases is found in Keech's demand for discovery which was predicated on Genser II guidelines. That distinction, however, is not sufficient to require a result different from the one we have reached in the Shafer appeals.
 
 
 74
 Whereas Genser II had not been filed at the time the district court disposed of Shafer's initial objections to enforcement, See note 1 Supra, it was referred to and relied upon in the Keech papers and at the time of the Keech oral argument. Our comparison, however, of that information to which Keech would be entitled under Genser II's basic discovery formula, with the information available to Keech either as a result of the New York action, See note 8 Supra, or in the course of this litigation, satisfies us that ordering basic discovery would be meaningless and would amount to no more than an academic exercise. It is evident to us that Keech had virtually all the information which would have been afforded to him under Genser II basic discovery.[20]
 
 V.
 
 75
 The orders of the district court enforcing all of the Shafer and Keech summonses, will be affirmed.
 
 APPENDIX
 26 U.S.C. § 7602, I.R.C. § 7602, states:
 
 76
 For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
 
 
 77
 (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and
 
 
 78
 (3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.
 
 26 U.S.C. § 7604, I.R.C. § 7604, states:
 
 79
 (a) Jurisdiction of district court. If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.
 
 
 80
 (b) Enforcement. Whenever any person summoned under section 6420(e)(2), 6421(f)(2), 6424(d)(2), 6427(g)(2), or 7602 neglects or refuses to obey such summons, or to produce books, papers, records, or other data, or to give testimony, as required, the Secretary may apply to the judge of the district court or to a United States commissioner for the district within which the person so summoned resides or is found for an attachment against him as for a contempt. It shall be the duty of the judge or commissioner to hear the application, and, if satisfactory proof is made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing the judge or the United States commissioner shall have power to make such order as he shall deem proper, not inconsistent with the law for the punishment of contempts, to enforce obedience to the requirements of the summons and to punish such person for his default or disobedience.
 
 
 81
 26 U.S.C. § 7609(a)-(b), I.R.C. § 7609(a)-(b), states:
 
 
 82
 (a) Notice.
 
 
 83
 (1) In general. If
 
 
 84
 (A) any summons described in subsection (c) is served on any person who is a third-party recordkeeper, and
 
 
 85
 (B) the summons requires the production of any portion of records made or kept of the business transactions or affairs of any person (other than the person summoned) who is identified in the description of the records contained in the summons,
 
 
 86
 then notice of the summons shall be given to any person so identified within 3 days of the day on which such service is made, but no later than the 14th day before the day fixed in the summons as the day upon which such records are to be examined. Such notice shall be accompanied by a copy of the summons which has been served and shall contain directions for staying compliance with the summons under subsection (b)(2).
 
 
 87
 (2) Sufficiency of notice. Such notice shall be sufficient if, on or before such third day, such notice is served in the manner provided in section 7603 (relating to service of summons) upon the person entitled to notice, or is mailed by certified or registered mail to the last known address of such person, or, in the absence of a last known address, is left with the person summoned. If such notice is mailed, it shall be sufficient if mailed to the last known address of the person entitled to notice or, in the case of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, to the last known address of the fiduciary of such person, even if such person or fiduciary is then deceased, under a legal disability, or no longer in existence.
 
 
 88
 (3) Third-party recordkeeper defined. For purposes of this subsection, the term "third-party recordkeeper" means
 
 
 89
 (A) any mutual savings bank, cooperative bank, domestic building and loan association, or other savings institution chartered and supervised as a savings and loan or similar association under Federal or State law, any bank (as defined in section 581), or any credit union (within the meaning of section 501(c)(14)(A));
 
 
 90
 (B) any consumer reporting agency (as defined under section 603(d) of the Fair Credit Reporting Act (15 U.S.C. 1681a(f));
 
 
 91
 (C) any person extending credit through the use of credit cards or similar devices;
 
 
 92
 (D) any broker (as defined in section 3(a)(4) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(4));
 
 
 93
 (E) any attorney; and
 
 
 94
 (F) any accountant.
 
 
 95
 (4) Exceptions. Paragraph (1) shall not apply to any summons
 
 
 96
 (A) served on the person with respect to whose liability the summons is issued, or any officer or employee of such person,
 
 
 97
 (B) to determine whether or not records of the business transactions or affairs of an identified person have been made or kept, or
 
 
 98
 (C) described in subsection (f).
 
 
 99
 (5) Nature of summons. Any summons to which this subsection applies (and any summons in aid of collection described in subsection (c)(2)(B)) shall identify the taxpayer to whom the summons relates or the other person to whom the records pertain and shall provide such other information as will enable the person summoned to locate the records required under the summons.
 
 
 100
 (b) Right to intervene; right to stay compliance.
 
 
 101
 (1) Intervention. Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to intervene in any proceeding with respect to the enforcement of such summons under section 7604.
 
 
 102
 (2) Right to stay compliance. Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to stay compliance with the summons if, not later than the 14th day after the day such notice is given in the manner provided in subsection (a) (2)
 
 
 103
 (A) notice in writing is given to the person summoned not to comply with the summons, and
 
 
 104
 (B) a copy of such notice not to comply with the summons is mailed by registered or certified mail to such person and to such office as the Secretary may direct in the notice referred to in subsection (a)(1).
 
 
 105
 Section 7609(a)-(b) was enacted in 1976, Tax Reform Act of 1976, Pub.L.No.94-455, § 1205(a), 90 Stat. 1699.
 
 
 
 [1]
 All told, six summonses were issued by I.R.S. for Shafer records. The appeal at No. 79-1681 included two summonses, one addressed to the United Jersey Bank and the other to the Columbia Savings and Loan Association. In the proceedings involving those summonses, Marilee Shafer (evidently Shafer's wife) appeared. These two summonses and the proceedings for their enforcement were consolidated on May 22, 1979 in the district court. Subsequently, they were appealed to this court, and an order of this court entered June 1, 1979 consolidated those appeals with the appeals at Nos. 79-1425 through 79-1428
 In the case of all Shafer summonses except United Jersey and Columbia, the district court in ordering enforcement did not have the benefit of United States v. Genser, 595 F.2d 146 (3d Cir. 1979) (Genser II ), which was filed on March 9, 1979. The Genser opinion upon which the district court relied, United States v. Genser, 582 F.2d 292 (3d Cir. 1979) (Genser I ), was filed some seven months earlier, on August 29, 1978. The basis of the district court's disposition of the earlier four summonses is set forth at p. 64 Infra. The district court's enforcement of the United Jersey and Columbia summonses was predicated on the same reasoning which had been employed by the district court in enforcing the Keech summonses, See p. 65 Infra.
 Inasmuch as no separate issues on appeal in No. 79-1681 appear as to Marilee Shafer, and no separate issues on appeal in No. 79-1682 appear as to Sandra Keech, we discuss only the common issues presented by the various appeals.
 
 
 [2]
 An appellate court may affirm a correct decision of a district court although that decision is based upon an incorrect ground. PAAC v. Rizzo, 502 F.2d 306, 308 & n.1 (3d Cir. 1974), Cert. denied, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975); Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937)
 
 
 [3]
 Special agents are officially part of the Criminal Investigation Division (formerly the Intelligence Division), and revenue agents are part of the Examinations Division (formerly the Audit Division). That little significance is to be attached to these designations is clear from United States v. LaSalle National Bank, 437 U.S. at 300, 308-11, 98 S.Ct. 2357, and Donaldson v. United States, 400 U.S. 517, 535-36, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). Special agents conduct investigations of Both civil and criminal liability with or without the assistance of revenue agents
 
 
 [4]
 The statutory text of 26 U.S.C. §§ 7602, 7604, 7609(a)-(b), I.R.C. §§ 7602, 7604, 7609(a)-(b), appears as an appendix to this opinion
 
 
 [5]
 On April 5, 1979, enforcement was sought by the Government of the United Jersey summons, and apparently of the Columbia Savings and Loan summons, both of which had issued in January. On May 14, 1979, a hearing was held by the district court. On that same day, enforcement was ordered
 
 
 [6]
 The same investigation of Shafer also resulted in summonses issued to four New York banks for production of similar records. These were enforced in United States v. Shafer, No. M-18-304 (S.D.N.Y. Dec. 14, 1978), Aff'd mem., 598 F.2d 610 (2d Cir. 1979). No opinion was published by either court, and no petition for certiorari was filed. The Government contends that the same issues involved in this appeal were raised and disposed of by the Second Circuit. Shafer disputes this, arguing that the records in the two cases differ. We do not decide this issue
 
 
 [7]
 The Government, while seeking our affirmance of the district court's order, has nevertheless noted its strong disagreement with the district court's analysis. Accordingly, the Government has urged us to correct any impression left by the district court that the enforcement of a summons hinges on either a request for, or the availability of a "compromise conference."
 The teachings of LaSalle, the Genser trilogy, McCarthy and Serubo, as they are discussed Infra, as well as the grounds upon which we base our disposition, should dispel the Government's concern. We reject any suggestion that enforcement may be granted or denied wholly upon the basis of a taxpayer's request or lack of request for a compromise conference, or wholly upon the availability or unavailability of a compromise negotiation conducted with I.R.S.
 
 
 [8]
 During the same investigation of Keech, a summons had been issued on June 17, 1977 to Morgan Guaranty Trust Co. of New York City. After hearing oral argument, the district court (S.D.N.Y.) enforced the summons, and the Second Circuit affirmed. United States v. Morgan Guaranty Trust Co., 572 F.2d 36 (2d Cir. 1978), Cert. denied, 439 U.S. 997, 99 S.Ct. 599, 58 L.Ed.2d 671 (1978). Other related summonses as well have been enforced
 
 
 [9]
 The Court rejected the interpretation of Donaldson v. United States, 400 U.S. 517, 536, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), found in our case of United States v. Lafko, 520 F.2d 622, 625 (3d Cir. 1975). Lafko had read Donaldson as imposing the cutoff at the time when the investigating agent recommended prosecution to his superiors
 
 
 [10]
 The Court held the investigating agent's personal intentions and beliefs to be relevant only to the question of the Powell inquiry, E. g. whether the agent acted in bad faith by issuing a summons to harass a taxpayer, 437 U.S. at 316 n.17, 98 S.Ct. 2357. Personal motive is not relevant to the second-phase question of the Service's good faith in pursuing civil tax liability
 
 
 [11]
 Genser and Serubo involved taxpayers who had been convicted of criminal tax violations and appealed based on contentions that the summonses were enforced erroneously and therefore, any evidence obtained thereby should have been suppressed. We perceive no reason to treat the question of the validity of I.R.S. summonses any differently in the present cases, simply because the summonses in question have not yet been enforced. The only difference lies in the remedy whether or not to enforce the summons, as opposed to whether or not to reverse a conviction
 In Genser, the summonses had not been challenged before enforcement because the taxpayers had had no notice of them. See Genser I, 582 F.2d at 302. The provision of the Internal Revenue Code requiring notice and allowing the taxpayer to stay compliance was not enacted until 1976, See appendix Infra, and was enacted to curb this injustice. See 4 (1976) U.S. Code Cong. & Admin. News pp. 2897, 3202-04. There is no indication that the enactment of this section was intended to alter the substantive standards developed in the case law for the ultimate Validity of I.R.S. summonses. Indeed such a suggestion was refuted by the Committee Report. See id. at 3205.
 This issue did not arise in LaSalle because the bank to which the summonses were issued in LaSalle refused to produce the requested documents, forcing the Government to petition the district court for enforcement. See LaSalle, 437 U.S. at 302, 98 S.Ct. 2357.
 
 
 [12]
 Compare Genser II with LaSalle, 437 U.S. at 316-17, 98 S.Ct. 2357, where the Supreme Court noted that "bad faith" on the institutional level would be shown analogously if the I.R.S. were acting as a conduit for the Justice Department, or if the I.R.S. were trying to evade the prophylactic rule by delaying formal referral for prosecution after the decision had been made until the summonses had been enforced, solely to gather additional information for the prosecution
 
 
 [13]
 If a hearing is authorized by McCarthy, additional discovery may be allowed After the hearing if the taxpayer shows at the hearing that the I.R.S. acted in "bad faith." McCarthy, 514 F.2d at 376 & n.10. Indeed, as Genser I points out, 582 F.2d at 302, "(i)f the district court concludes that it cannot fairly decide the case on the record before it, it may direct further proceedings, including discovery, if requested."
 
 
 [14]
 Shafer was in fact afforded evidentiary hearings by the district court. See note 16 Infra; 72 Infra
 
 
 [15]
 In McCarthy, as here, it was undisputed that no recommendation to the Justice Department for criminal prosecution had been made prior to issuance of the summons. 514 F.2d at 374
 
 
 [16]
 The record discloses no affidavits filed on behalf of Shafer with respect to the United Jersey and Columbia summonses, both of which are the subject of appeal at No. 79-1681. Despite this, the district court held an evidentiary hearing with respect to these proceedings, at which Special Agent McCorry testified. See Trial Transcript, May 14, 1979
 The present discussion, therefore, is concerned wholly with the affidavit filed on behalf of Shafer in Nos. 79-1425 through 79-1428.
 
 
 [17]
 At the hearing discussed Infra, McCorry was unequivocal in his testimony that no such recommendation had ever been made. Trial Transcript, Jan. 11, 1979, at 34
 
 
 [18]
 It should be remembered that this discussion focuses on the earlier four summonses which were issued and which are appealed at Nos. 79-1425 through 79-1428. Recognizing the date of issuance, January 19, 1979, and the date on which enforcement was sought, April 5, 1979, it is understandable why no issue is raised on appeal with respect to delay as to the United Jersey and Columbia summonses. See 64 Supra; notes 1 & 5 Supra
 
 
 [19]
 Keech's affidavit alleges two delays in I.R.S.' attempt to enforce summonses; a special agent is claimed to have stated that I.R.S. was conducting a criminal investigation of the taxpayer; only the tax liability of Roger Keech was being investigated although joint returns had been filed; and the return for one of the years under investigation had been audited and the return accepted as filed
 
 
 [20]
 The alleged delays asserted in the Keech affidavit would entitle Keech to no more than basic discovery